# Dowling v. Lincoln Deposit and Trust Company.

McIlvain, Murphy & Mohn and John Woodcock, for plaintiff.

Scheeline & Smith and Robert W. Smith, for defendant.

PATTERSON, P. J., Sept. 16, 1929.—This is an action brought by the plaintiff against the defendant to recover the sum of $10,000 claimed in the original plaintiff's statement, and reduced to $9000 in two amended statements, and representing a loss alleged to have been sustained by plaintiff as a result of defendant's retention of 100 shares of Superior Silicia Brick Company stock, represented by certificate No. 242. Upon the trial of the case, a judgment of non-suit was entered, and we are now asked to strike it off.

### Findings of fact.

In April, 1920, the plaintiff was the owner of a certain certificate of the capital stock of the Superior Silicia Brick Company, No. 242, and dated Aug. 8, 1919, for 100 shares of the said Superior Silicia Brick Company of the par value per share of $100. At that time plaintiff was sales agent for the Superior Silicia Brick Company and Charles W. Albright was president of said brick company. The plaintiff and said Charles W. Albright became acquainted the latter part of the year 1919, and in their respective capacities were interested in the promotion of the Superior Silicia Brick Company.

Albright, at the same time, was also president of the Lincoln Deposit and Trust Company of Altoona, Pennsylvania. In April of 1920, when the plaintiff purchased 100 shares of the original stock of the Superior Silicia Brick Company at $85 per share, Albright, as president of the brick company, demanded and received from him a note for $8000, payable to Albright individually, and $500 in cash, Albright saying to Dowling (so Dowling testifies) that he would discount the note at his bank and would use the certificate for 100 shares as collateral. The bank records show that the note was discounted at the bank on June 8, 1920, and that the collateral attached to the same consisted of certificate No. 61, in the name of Ellis L. Orvis, for fifty shares, and four certificates, Nos. 120, 124, 128 and 129, representing fifty shares in the name of Charles W. Albright. There is no bank record to establish the fact that certificate No. 242, belonging to the plaintiff, was ever attached to the note or at any time deposited as collateral with the bank.

Charles W. Albright, a witness called by plaintiff, testified that the certificate of stock No. 242, representing 100 shares, was delivered to the witness Albright to secure the payment of the note given as consideration for the purchase of said stock, and that he, Albright, used certificate No. 242 at the First National Bank at Bellefonte to procure a loan for the operation of the brick company in which both were interested. After the Dowling note was discounted at the Lincoln Deposit and Trust Company, Dowling paid interest from month to month until about Oct. 1, 1920, when the said Charles W. Albright requested the plaintiff to pay the note at the Lincoln Deposit and Trust Company, and they together arranged for a loan at the First National Bank of Pittsburgh in the sum of $8000, Albright depositing 400 shares of Manufacturers' Coal Company stock belonging to him as collateral.

The plaintiff testified that he had an understanding with Albright that the proceeds of the loan from the Pittsburgh bank should be used to pay off his debt at the Lincoln Deposit and Trust Company. The transaction at the Pittsburgh bank was dated Oct. 4, 1920. On Nov. 1st the plaintiff received notice from the Altoona bank that his note there had not been paid. After receiving this notice, plaintiff called upon Charles W. Albright and received from him a promise to pay the interest, and the principal later. About seven or eight months later, Dowling received further notice demanding payment on the note and interest from Mr. Hutchison, who succeeded Albright as president of the Lincoln Deposit and Trust Company. In the meantime, Albright resigned as president of the bank and went into bankruptcy. After plaintiff learned on Nov. 1, 1920, that the money borrowed from the First National Bank of Pittsburgh had not been used to pay his loan at the Lincoln Deposit and Trust Company, he continued to pay interest at the First National Bank of Pittsburgh and from time to time renewed the note at that bank.

## Discussion.

An investigation of the transaction at that time would have disclosed that the proceeds of the loan from the Pittsburgh bank had never been deposited to the credit of the plaintiff in the Lincoln Deposit and Trust Company bank or applied in payment of the note which said bank held against plaintiff, but had been deposited to the account of Charles W. Albright and used by him. An investigation would have further established the fact that the certificate of stock upon which this suit is based had never been with the Lincoln Deposit and Trust Company of Altoona. For some reason which does not appear of record, the plaintiff allowed the matter to go by default. There has never been any civil or criminal suit against Charles W. Albright for the wrongful

application of said stock and the misappropriation of the proceeds of the loan from the Pittsburgh bank. The plaintiff was the only person other than Charles W. Albright who knew all of the facts in connection with the series of transactions, including the purchase and payment of the brick stock, the negotiation of the loan and the non-payment of the same at the Lincoln Deposit and Trust Company and the loan at the First National Bank of Pittsburgh. Notwithstanding his knowledge that his note was not paid, he made no demand upon the Altoona bank for the return of his stock now in question. In fact, he made no investigation at any time to determine whether or not his stock had ever been deposited as collateral with the Altoona bank. And it was not until March 25, 1925, that the plaintiff for the first time learned that the collateral attached to the Altoona bank loan was that issued in the name of Charles W. Albright and Ellis Orvis, although this knowledge could have been obtained by him at any time upon inquiry of the bank officials at their place of business in the City of Altoona. Plaintiff testifies that he did call upon the said Charles W. Albright and demand of him the payment of the note and the return of his stock after he had received the interest notice on Nov. 1, 1920, but nothing further was done in the matter until the institution of this suit on Jan. 16, 1922, or a period of one year and two months after plaintiff had notice that something was wrong.

It cannot be successfully contended in this case that Albright was acting solely as president of the Altoona bank. As president of the brick company, he had made the sale of the brick stock to Dowling and received the consideration therefor. Dowling did not know any other individual connected with the Altoona bank. Neither did he have an account with said bank. Albright, and not Dowling, arranged for the loan at the Altoona bank. It was Albright's stock that was attached to the note as collateral security. It was Albright, also, who posted the collateral security and arranged for the loan from the First National Bank at Pittsburgh. Surely, the Lincoln Deposit and Trust Company was no party to the negotiating of the loan at Pittsburgh. There were two individuals interested in that transaction, namely, the plaintiff and Charles W. Albright. From a careful examination of the facts and the law, we are of opinion that the judgment of compulsory non-suit was properly entered, for the reason that the plaintiff failed, first, to support the *allegata* by the *probata*. The averment of the plaintiff that he negotiated the loan from the Lincoln Deposit and Trust Company and deposited with said trust company his certificate of stock No. 242, or that the said certificate of stock was deposited as collateral security for said loan, is not supported by the proof. He personally never negotiated the loan in question, neither did he deposit the stock described or any other stock as collateral security. Second, Charles W. Albright in this transaction was acting as the agent and associate of the plaintiff and not as president of the Lincoln Deposit and Trust Company. There is no evidence that the knowledge that Albright had was ever made known to any other person or persons connected with said bank. And in such case it has been ruled many times by our Supreme Court that such knowledge cannot be imputed to the bank. Third, the plaintiff has no standing on account of his laches. It was his duty, upon learning of the misapplication of the proceeds of the loan from the First National Bank of Pittsburgh, to ascertain what had become of the same. So far as he, Dowling, knew, no person connected with the Lincoln Deposit and Trust Company, except Albright, knew of this transaction. It was his duty to inform other members of the banking firm and learn what had become of his money and his stock. He could not wait seven or eight months, until such time as Albright was no

longer president of the bank and in bankruptcy. It was alone his duty to prosecute Albright for misappropriation of this fund or to institute civil action against Albright for its recovery. No one else knew the facts, and yet he allowed months and years to go by, relying upon Albright's promise to take care of him.

### Legal conclusions.

It is a well-settled principle of law that the burden is upon the plaintiff in an action such as this to support the allegations of his statement by proof, and, upon failure to meet this requirement, it is the duty of the court to enter a compulsory non-suit.

"A non-suit will not be taken off which has been granted by reason of a discrepancy between the allegations in the *narr* and the proof at the trial:" Jenneson *v*. Camden & Amboy R. R. Co., 5 Clark, 409.

Albright, in this case, was acting in his own behalf and as agent for Dowling, and was not negotiating the particular business in question as president of the bank. In the case of Dominion Trust Co. *v*. Hildner, 243 Pa. 253, it was held: "But, as the court below says, his knowledge of the facts was not gained while acting in any way for the trust company. He was acting for himself, or for another concern, in a different transaction. And in selling the note to the plaintiff company, his interests were antagonistic. It is true that in another capacity he was the agent of plaintiff. But, as was said in Gunster *v*. Scranton Illuminating Heat & Power Co., 181 Pa. 327, 'no agent who is acting in his own antagonistic interest, or who is about to commit a fraud by which his principal will be affected, does in fact inform the latter, and any conclusion drawn from a presumption that he has done so is contrary to all experience of human nature.' In the same opinion reference is made to the authorities which hold clearly that a bank officer who offers to his bank a note for discount is to be regarded in that transaction as a stranger, and the bank is not chargeable with the officer's knowledge of fraud or want of consideration for the note. This principle must be regarded as settled law. See Merchants' National Bank *v*. Lovitt, 114 Mo. 519, and the cases there cited."

The Supreme Court, in the case of Allegheny By-Product Coke Co. *v*. J. H. Hillman & Sons Co., 275 Pa. 191, 203, says: "Particularly should his conduct be investigated where the agent stands in the peculiar relationship such as here appears. Hillman, the president of the defendant corporation, purchased an interest in the plaintiff company in the fall of 1916, and within a few months became a director. In making the subsequent contracts he was an active negotiator, and the actions of the agent were likewise controlled by him. There is no reason why an official of the corporation cannot be legally employed by it and receive compensation for his services, but his actions are subject to close scrutiny, and may be avoided if overreaching appears."

And it is further held in Wilson *v*. Second National Bank of Pittsburgh, 4 Sadler, 68, 7 Atl. Repr. 145: "The knowledge of Wilson as treasurer of the tool company cannot be imputed to the bank of which he was cashier, unless he revealed that knowledge to some one or more of its officers; but of this there is no evidence."

While either of the above rules of law is, in our judgment, fatal to the plaintiff's cause, he meets with the most serious of all obstacles when we come to consider his withholding from the defendant bank the vitally important knowledge of the transaction which so materially involves the rights of the parties to this action. It seems to us that it would be unreasonable, unjust and without any excuse whatsoever for the courts to permit the plaintiff to profit as a result of a fraud which he knew had been committed in less than

thirty days after the commission of the same and yet withheld that knowledge from other officers of the defendant bank. This case, in our judgment, finds the plaintiff in exactly the same legal position as he was in in the case of the First National Bank of Pittsburgh v. Dowling, 286 Pa. 483. In opinion by Mr. Justice Kephart, the Supreme Court says (page 487) : "Appellee [Dowling] knew the money was to be used to pay off his Lincoln bank note. That was not done. Knowing that fact, whether instructions were sent or not by the Pittsburgh bank, it was his duty, in the exercise of ordinary diligence, to ascertain why his note was not paid: Padgett v. Lewis [54 Fla. 177, supra]; Montfort v. American Guano Co., 108 Ga. 12, 33 S. E. Repr. 636. He would then have learned, if it was a fact, that the Pittsburgh bank had not given the notice. His further duty, before giving the renewal note, which admitted the indebtedness without reservation, was to notify the Pittsburgh bank of what had occurred." And on page 486: "Nor is this a case of appellant acting as an agent in transmitting the information to the Lincoln bank. Even assuming that it is, however, appellee knew, when he received the demand for interest from this bank, that his instructions had not been carried out somewhere along the line. Had proper steps been taken, his agent, appellant, could have proceeded in some way to eliminate or reduce the loss. This was a substantial right that appellee could not, at least negligently, injure. . . . Had some action been taken at once or within a reasonable time after the principal discovered the default, appellant might not now complain. . . . Appellant was never given an opportunity to enforce any right it might have had against the Altoona institution. Consequently, appellee [Dowling] is now estopped from setting up failure to give notice as a defense; his silence as to this defense, when he ought to have spoken, precludes him from being heard, when he should be silent."

The motion to take off compulsory non-suit is hereby refused and new trial overruled.